UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>JOE NERSESYAN,<br><br>        Defendant. | No.  2:16-cr-00108-GEB<br><br>**AMENDED ORDER** |

        Defendant Joe Nersesyan moves for suppression of the following statements he made to California Highway Patrol Officer ("CHP") Kevin Ward during a traffic stop, which eventually included a vehicle towing inventory: "he had taken [two rifles officer Ward found during the vehicle towing inventory] to a firing range [for target shooting] on the day prior to the traffic stop." (Def.'s Reply, ECF No. 34, 2:4-8.) Officer Ward found the two rifles in the trunk of the stopped vehicle. Nersesyan is charged in this federal action with one count of unlawful possession of a machinegun in violation of 18 U.S.C. § 922(o).

1

Nersesyan argues these statements must be suppressed because they are the fruit of an "in custody" interrogation proscribed by the Supreme court in Miranda v. Arizona, 384 U.S. 436 (1966). (Def.'s Mot., ECF No. 35, at 13:1 12.) The government opposes suppression, arguing Nersesyan was neither in custody nor had been interrogated when he made the challenged statements. (Gov't's Opp'n, ECF No. 44.)

Nersesyan supports his motion with the CHP Arrest-Investigation Report prepared by officer Ward and the CHP dashboard video camera footage. That evidence shows the following. Officer Ward activated the forward emergency lights on the CHP vehicle he was driving after he saw a Mercedes did not have a front license plate. The driver of the Mercedes responded to the vehicle stop command by stopping at a gas pump in an Arco gas station. Officer Ward then exited the CHP vehicle and approached the driver-side window of the Mercedes, from where he spoke to the occupants in the Mercedes, and determined that no occupant had a valid driver's license. Jason Horne was the driver of the Mercedes. Nersesyan sat in the front passenger seat of the Mercedes, and Ms. Carina Golovey sat in the rear passenger seat.

Officer Ward asked the driver, Jason Horne, to exit the vehicle. After Horne exited the Mercedes, Horne walked to the rear of the vehicle where he was not in view of the police CHP patrol car's dashboard camera. At that location, officer Ward asked Horne if he had any weapons on him. Horne responded he was not sure. Officer Ward then checked Horne's pockets for weapons; Horne spontaneously said he had needles in his possession. Officer Ward then asked Horne if he had any drugs in the

2

Mercedes. Horne replied he did not know because the car belonged to Nersesyan. Horne had one hypodermic needle in his possession. When officer Ward was interacting with Horne a second CHP officer arrived and then stood by the driver-side of the Mercedes.

Officer Ward summoned for a tow truck since no occupant in the vehicle had a valid driver's license and he decided the Mercedes would be towed under a provision of the California Vehicle Code. Officer Ward placed Horne in the patrol car, and returned to the driver-side of the Mercedes to speak with Nersesyan through the driver-side window. Nersesyan subsequently exited the Mercedes through the front passenger door and walked to the patrol car, where he met officer Ward. Nersesyan removed items from his pockets and placed them on the hood of the patrol car, and was then patted down by officer Ward. Nersesyan was not handcuffed.

Officer Ward explains as follows in the CHP Arrest-Investigation Report about his interaction with Nersesyan and what was found during the inventory search of the Mercedes:

> I then re-contacted the right front passenger, Mr. Nersesyan, and asked him about the ownership of the vehicle. Mr. Nersesyan stated that his car had been in an accident and he was borrowing the Mercedes from the auto-body shop that was fixing his car. I asked him how long he had possession of the vehicle and he stated that he had [the] car for more than two and a half months. I asked him if the property within the vehicle was his and he said yes, except for the purse belonging to the rear passenger (Golovey) . . . After having each of the occupants exit the vehicle I began an inventory of the vehicle. I found a hypodermic needle on the front passenger

3

floor board, another hypodermic needle in the passenger side glove box, and a black case with drugs and drug paraphernalia under the right front passenger seat, in a small compartment.  Inside the black plastic case I located a small baggy with .5 grams of Methamphetamine, 4 hypodermic needles with drug residue, a silver spoon still wet from recent use and with drug residue, and a glass pipe with methamphetamine stuck inside.

In the trunk of the Mercedes I located 2 rifles, a Winchester Model 94, 38-55 caliber and a Thompson submachine gun made by Auto-Ordinance Corp., 45 Auto. In the trunk I also located 50 rounds of 45 Auto ammunition loose in the trunk, a box of 20 rounds of 45 auto ammunition, and 2 high capacity magazines for the Thompson. One magazine was a straight mag, which held 20 rounds of 45 auto ammunition and a circular drum, which held 50 rounds of 45 auto ammunition.

After locating the methamphetamine, the hypodermic needles, the glass drug pipe, the two rifles, the 2 high capacity magazines, and the ammunition in Mr. Nersesyan's car I contacted [Mr. Nersesyan] about the items. Mr. Nersesyan stated that the two guns were his guns and he had forgotten that they were in the trunk. He stated that he had taken them to the Sacramento Valley Shooting Center the day before this traffic stop for target shooting. I asked Mr. Nersesyan if he had any paperwork showing ownership of the guns and he stated that he did not. I asked how long he had the guns and he wasn't able to give an estimate. He also stated that the drugs were not his. He stated that he did not use drugs. I then explained to Mr. Nersesyan that the drugs, the needles, and the drug paraphernalia were found in several places in his car. The same car he stated that he had possession of for more than two months. Mr. Nersesyan then attempted to blame the back passenger for the possession of the drugs. The location where I found the drugs was not

4

|   |   |
|---|---|
| 1 | accessible to the passenger from her position in the back seat. |
| 2 | |
| 3 | At approximately 1545 hours, I detained Mr. Nersesyan and placed him in the back seat of my patrol vehicle. I then issued a citation to Mr. Horne, the driver, for violation of 12500(a)VC, unlicensed driver. Mr. Horne and Ms. Golovey were then released from the traffic stop and they left on foot. |
| 4 | |
| 5 | |
| 6 | |
| 7 | [CHP] Officer Erikson #15866, who responded to the scene of this traffic stop to assist, completed the CHP-180 (Vehicle Report). While completing the impound on the Mercedes Officer Erikson located a pistol in the engine compartment. The pistol was wrapped in a pink towel, pressed up against the firewall, and was immediately visible when the hood was lifted. I discovered that the pistol was a HK model VP-9, 9mm pistol, and was loaded with 8 rounds of 9mm ammunition. There were 7 rounds in the magazine and 1 round in the chamber. A registration check on the pistol revealed that the handgun had been reported stolen by the owner to the Sacramento Sheriff's Department on August 25th, 2015, case# 15-216487. |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | I then placed Mr. Nersesyan under arrest for the possession of the drugs, the drug paraphernalia, and possession of the stolen pistol. Mr. Nersesyan made a spontaneous statement that the handgun was not his while I was advising him of the charges. |
| 18 | |
| 19 | |
| 20 | |
| 21 | Ex. B-Def.'s Mot, ECF No. 42. |
| 22 | The Supreme Court explains in Miranda that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he [has certain constitutional rights, and that] such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." Miranda, 384 U.S. at 467-68. It is |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

5

undisputed that Nersesyan was not informed of those rights. The Ninth Circuit states:

> To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. The court must examine the totality of the circumstances surrounding the interrogation. A defendant is in custody if a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave. The custody determination is objective and is not based upon the subjective views of the officers or the individual being questioned.
>
> [The Ninth Circuit has] identified five factors relevant to the custody determination: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. These considerations are not exhaustive; other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators.

United States v. Bassignani, 575 F.3d 879, 883–84 (9th Cir. 2009) (citations and quotations omitted).

The custody factor concerning the language used to summon Nersesyan to the area near the CHP vehicle where he made the statements does not weigh in favor of finding that Nersesyan was in custody under Miranda. Officer Ward instructed Nersesyan to exit the passenger-side of the Mercedes and proceed to the

6

1  rear of the vehicle. The "'instruction' [was] short of an
2  'order,'" United States v. Bassignani, 575 F.3d 879, 884 (9th
3  Cir. 2009); however, such instructions are common in the context
4  of traffic stops.

5  Nor do the other factors weigh in favor of finding
6  Nersesyan was in custody. The Supreme Court explains an "ordinary
7  traffic stop mitigate[s] the danger that a person questioned will
8  be induced 'to speak where he would not otherwise do so freely.'"
9  Berkemer v. McCarty, 468 U.S. 420, 437 (1984) (quoting Miranda,
10 384 U.S., at 467). The Supreme Court also explains in
11 Pennsylvania v. Bruder 488 U.S. 9, 10 (1988) (citations and
12 quotations omitted): [A]lthough [traffic] stop[s are]
13 unquestionably a seizure within the meaning of the Fourth
14 Amendment, such traffic stops typically are brief, unlike a
15 prolonged station house interrogation[; additionally, such
16 traffic stops] commonly occur in the public view, in an
17 atmosphere far less police dominated than that surrounding the
18 kinds of interrogation at issue in Miranda itself[; and t]he
19 detained motorist's freedom of action [is] not curtailed to a
20 degree associated with formal arrest." The subject traffic
21 investigation occurred in the public view at an Arco gas station
22 in an urban area.

23 When officer Ward first questioned Nersesyan, the
24 officer inquired about the ownership of the vehicle, the duration
25 of Nersesyan's possession of the vehicle, and the ownership of
26 the property inside the vehicle. After Nersesyan responded to
27 those questions, the officer left Nersesyan at the back of the
28 Mercedes unaccompanied while the officer engaged in other

investigative activities. During this period, Nersesyan is seen on the video camera footage using his cell phone.

Nersesyan argues that "Ward's report indicates that after [officer Ward found the rifles], ammunition, high capacity magazines, . . . methamphetamine and . . . drug paraphernalia, [Ward subjected him to a custodial interrogation] about those items." (Def.'s Mot. at 12:2-5). Nersesyan further argues these statements were "taken from [him] about 45 to 50 minutes after the car was stopped." Id. at 12:17-19. The Mercedes was stopped at approximately 2:50 p.m. and Nersesyan was ultimately placed in the CHP vehicle at 3:45 p.m., which occurred after he made the subject statements.  Prior to being placed under arrest and then placed in the CHP vehicle, Nersesyan was standing in the area where officer Ward first asked Nersesyan questions.

Nersesyan contends that officer Ward's subsequent questioning was imbued with an accusatory nature and evinced, when considered in conjunction with statements Nersesyan had made when he was questioned earlier, that the officer was seeking incriminatory information. Specifically, Nersesyan argues he had already told the officer that:

> everything in the car, except for Golovey's purse, belonged to him. Therefore, at the point Officer Ward confronted [him] with the items he had found, he had probable cause to arrest him, and even a lay person, like Nersesyan, [knew] that possession of methamphetamine is illegal. Therefore, a reasonable person in Nersesyan's position would not have felt free to terminate the questioning and leave the scene once he was confronted with the incriminating evidence.

Def.'s Mot. at 21:2-10.

8

The CHP Arrest-Investigation Report reveals that when Officer Ward contacted Nersesyan about found rifles, Nersesyan stated the rifles were his; he had forgotten they were in the trunk; and he had taken them to the Sacramento Valley Shooting Center the day before for target shooting. Ex. B-Def.'s Mot. Officer Ward then asked Nersesyan if he had any paperwork showing ownership of the rifles, and Nersesyan responded he did not. Id. Officer Ward asked Nersesyan how long he had the rifles and Nersesyan responded he could not give an estimate. Id. Regarding the drugs and paraphernalia, Nersesyan stated the drugs were not his, that he did not use drugs, and the drugs belonged to the back seated passenger. Id.

Nersesyan's responses to the officer and the questioning atmosphere do not indicate Nersesyan had "a reason to feel intimidated." United States v. Snodgrass, 635 F.3d 324, 328 (7th Cir. 2011). He patently denied any knowledge about the drugs and paraphernalia, admitted the rifles were his, and volunteered information about accidently leaving the rifles in the Mercedes after he took them to a shooting range. A reasonable person in Nersesyan's position would have felt free to have not made the challenged statements. See United States v. Woods, 720 F.2d 1022, 1029 (9th Cir. 1983) (stating "brief questioning of appellants in the cocktail lounge was not custodial under Miranda simply because they were under investigation for a narcotics violation and were not free to leave").

Considering "all of the circumstances surrounding [officer Ward's questions] and . . . how a reasonable person in [Nersesyan's] position . . . would gauge the breadth of his . . .

9

freedom of action" the evidentiary record does not support Nersesyan's argument that he was in custody when he made the challenged statements. Yarborough v. Alvarado, 541 U.S. 652, 663 (2004). Further, the record also indicates that the officer did not recognize that one of the rifles was an unlawful machine gun because he only placed Nersesyan under arrest for possession of the drugs, the drug paraphernalia, and the stolen pistol.

Therefore, the motion is denied. Accordingly, the hearing on the motion scheduled on January 13, 2017 is converted to a status hearing.

Dated: January 13, 2017

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

10